# Exhibit 1

# EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (this "Agreement"), is entered into as of November 22, 2021 by and between Anasazi Medical Payment Solutions, Inc., an Arizona corporation, d/b/a Advanced Medical Pricing Solutions (the "Company"), and Laura Conte, an individual ("Employee").

**WHEREAS**, Employee and the Company desire to enter into this Agreement effective as of the date hereof (the "Effective Date"), to set forth the terms and conditions of Employee's employment with the Company.

**NOW, THEREFORE,** in consideration of the premises and of the respective representations, warranties, covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Employment**.

    (a)    Commencing as of the Effective Date, the Company hereby agrees to employ Employee, and Employee hereby accepts such employment, as the Chief Legal Officer for the Company, with such duties and responsibilities as shall be set forth by the Chief Executive Officer of the Company, or any designee(s) thereof (collectively, the "CEO").  To the extent necessary to meet the Company's business goals, the CEO may modify Employee's duties or assign new duties to Employee or modify Employee's reporting relationships.  Employee shall devote all of Employee's business time, attention, and efforts to the performance of Employee's duties hereunder.  Employee shall faithfully adhere to, execute, and fulfill all lawful policies established by the Company.

    (b)    As consideration for the services performed by Employee, the Company shall pay Employee a base salary, which may be subject to annual adjustment, at the annual rate of $235,000 ("Base Salary"), payable in installments at such times as the Company customarily pays its other executives (but in any event no less often than monthly).  In addition to Employee's Base Salary, Employee shall be eligible to receive an annual incentive bonus of up to $50,000 (the "Incentive Bonus"), with the amount and criteria for such Incentive Bonus to be determined annually by the Board of Directors of the Company or its ultimate parent entity (the "Board") in its sole discretion.  So long as Employee remains employed by the Company, the Company will provide benefits to Employee no less favorable than those benefits made available generally to similarly situated employees of the Company.

    (c)    The Company agrees to reimburse Employee for all reasonable business travel and other out-of-pocket expenses incurred by Employee in the discharge of Employee's duties hereunder, subject to the Company's reimbursement policies in effect from time to time.  All reimbursable expenses shall be appropriately documented in reasonable detail by Employee upon submission of any request for reimbursement, and in a format and manner consistent with the Company's expense reporting policy, as may be in effect from time to time, as well as applicable federal and state record keeping requirements.

    (d)    Employee shall be entitled to four (4) weeks of vacation, with pay, during each calendar year of service under this Agreement, to be taken during the year at such time or times as determined by Employee and approved by the CEO. Vacation days not used in any one year shall not be accumulated and added to the vacation time for a subsequent year. Upon expiration or termination of this Agreement for any reason, all rights and interest in accrued but unused vacation days will be forfeited. Unused vacation days may not be used in lieu of notice of termination of this Agreement.

2. **Termination**.

[Signature Page to Employment Agreement]

(a) Employee's employment with the Company is at-will, and Employee's employment with the Company can be terminated by the Company or Employee for any reason, with or without Cause, and without prior notice provided that Employee shall provide the Company with two weeks' notice of any termination, including resignation for Good Reason (as hereinafter defined). "Good Reason" means: (i) a material detrimental change in Employee's job responsibilities, (ii) a material reduction in Employee's annual rate of Base Salary (other than any reduction pursuant to a company wide reduction of salaries); or (iii) a material change in the geographic location at which Employee must perform the services under this Agreement (which, for purposes of this Agreement, means relocation of the offices of the Company at which Employee is principally employed to a location more than twenty-five (25) miles from the location of such offices immediately prior to the relocation); provided, however, that Employee must provide the Company with written notice of the change constituting Good Reason within thirty (30) days of such change setting forth the basis therefor in writing.  Upon receipt of the same, the Company shall have thirty (30) days to discuss issues related to such change with Employee and to cure such change, which cure may not be unreasonably rejected by Employee.  If the Company fails to cure such change within such 30-day cure period, then a subsequent resignation by Employee shall be deemed due to "Good Reason" only if such resignation is effective no later than sixty (60) days after the end of the 30-day cure period. If the Employee provides notice of Good Reason termination, the Company may accelerate the effective date of such termination without penalty provided the Company pays any applicable Severance Payments under this **Section 2**.

(b) In the event that the Company terminates Employee's employment without Cause (as defined below) or the Employee resigns for Good Reason, Employee shall be entitled to receive the Severance Payment (as defined below); provided, however, that Employee's receipt of the Severance Payment is expressly conditioned on Employee's execution and non-revocation of a general release and waiver of any and all claims against the Company, including but not limited to claims arising out of Employee's employment or termination thereof in form and substance specified by and acceptable to the Company (the "Separation Release").  The Separation Release will include a non-competition provision.  The Separation Release will provide that Employee agrees to waive and release any claims Employee has against the Company, including but not limited to claims arising from Employee's employment relationship with the Company that may, by law, be waived and released, including without limitation, claims under Title VII of the Civil Rights Act of 1964, the Employee Retirement Income Security Act, the Fair Labor Standards Act, the Family and Medical Leave Act, the Americans with Disabilities Act, similar state and local laws, and other causes of action arising from situations, circumstances, events or occurrences relating to the employment relationship.  For avoidance of doubt, the Separation Release shall not apply to claims arising out of or related to Employee's ownership of a membership interest in Parent (as defined below).  The Salary Portion (as defined below) of the Severance Payment will be paid to Employee as follows:  a first payment, which will cover the first two (2) months of Employee's severance, will be paid to Employee in a lump sum cash payment on the sixtieth (60th) day following Employee's separation date, provided that Employee has executed, submitted to the Company, and not revoked the Separation Release and the revocation period for the Separation Release has expired, and the remaining amount of the Salary Portion of the Severance Payment will be paid to Employee in accordance with the Company's normal payroll practices in effect at the time of termination following such sixtieth (60th) day for the remaining period for which the Severance Payment is payable (the "Severance Period").  "Severance Payment" means six (6) months of Employee's Base Salary at the rate in effect as of Employee's separation date (the "Salary Portion"), the unpaid portion of any Incentive Bonus which has been fully earned as determined at the end of the applicable calendar year and all premiums payable with respect to continued coverage by the Company of Employee, Employee's spouse and eligible dependents on its medical and dental plans, to the extent covered under such plans immediately prior to Employee's termination date, for six (6) months, at the same premium rates that are charged to current employees receiving the same coverage; provided that (i) such continuation coverage shall cease to apply if Employee does not pay the applicable monthly premium or if Employee is eligible to receive other coverage from Employee's new employer or pursuant

to Employee's spouse's plans, (ii) the COBRA continuation period shall run currently with the Severance Period, so that, for such continuation coverage benefit to apply, Employee must elect COBRA continuation coverage at the time of Employee's termination of employment, and (iii) in the event that the Company determines in its discretion that it is not practicable or possible to continue to provide such medical or dental benefits, the Company shall reimburse Employee for the cost of replacing such benefits on an after-tax basis.  Notwithstanding anything contained in this Agreement, the Company shall have no obligation to make any unpaid portion of any Severance Payment to Employee in the event Employee breached or breaches, at any time prior to or after termination of employment, any covenant in this Agreement, including, but not limited to, any covenant contained in **Section 6(c)** hereof, or any covenant undertaken under any other written agreement with CHAMPS Holdings, LLC ("Parent"), the Company or any of the Company's subsidiaries or Affiliates, in each case whether or not such covenant is enforced for any other purpose.  For purposes hereof, "Affiliate" means any individual or entity that, directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with or of, such entity.  The term "Control" (including, with correlative meaning, the terms "Controlled by" and "under common Control with"), as used with respect to any entity, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity, whether through the ownership of voting securities, by contract or otherwise.

(c)     "Cause" shall mean (i) Employee's failure to perform Employee's duties as an employee or other associate of the Company or any of the Company subsidiaries, such failure to be determined by the Board, which failure has continued unremedied for more than thirty (30) days after the Company has provided written notice thereof (other than as a result of Employee's death or Disability (as defined below)); (ii) Employee's fraud, embezzlement or other material dishonesty or breach of fiduciary duty against the Company or any of the Company subsidiaries as determined by the Board; (iii) any conviction of, or the entering of a plea of guilty or nolo contendere to, a crime that constitutes a felony (or any state-law equivalent) or that involves moral turpitude, or any willful or material violation by Employee of any federal, state or foreign securities laws; (iv) any conviction of any other criminal act or act of material dishonesty, disloyalty or misconduct by Employee, as determined by the Board; (v) the use (including being under the influence) or possession of illegal drugs by Employee on the premises of the Company or any of the Company subsidiaries or while performing any duties or responsibilities with the Company or any of the Company subsidiaries; (vi) the material violation by Employee of any rule or policy of the Company or any of the Company subsidiaries or the commission of any act that involves moral turpitude, in each case as determined by the Board; or (vii) the breach by Employee of any covenant in this Agreement or any other written non-disclosure, non-competition, or non-solicitation covenant or agreement with Parent, the Company or any of the Company subsidiaries or Affiliates.  For purposes hereof, "Disability" means the inability of Employee to perform those duties and responsibilities which are the essential functions of Employee's position due to illness, accident or any other physical or mental incapacity for 90 consecutive days or 120 days in any 180 day period.

(d)     In the event of the death of Employee during the term of Employee's employment with the Company, this Agreement shall automatically terminate, and the Company shall have no further obligations hereunder except as provided in **Section 2(e)**.

(e)     Upon termination of this Agreement for any reason, Employee (or Employee's estate or personal representative, as applicable) shall be entitled to receive (i) all of Employee's accrued but unpaid Base Salary through the effective date of termination, whereafter no further Base Salary shall accrue, and (ii) reimbursement of any proper expenses in accordance with **Section 1(c)**, and in connection with Employee's termination upon Employee's death or Disability, Employee (or Employee's estate or personal representative, as applicable) shall be entitled to receive any earned but unpaid Incentive Bonus due for any calendar year ended prior to such death or Disability.

**3.     Withholding Taxes**.  The Company may withhold from any amounts payable under this Agreement such federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.  Employee shall bear all expense of, and shall be solely responsible for, any and all taxes associated with the compensation and benefits provided under this Agreement.

**4.     Section 409A of the Code**.

(a)     General.  Notwithstanding the other provisions hereof, this Agreement is intended to comply with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended ("Section 409A"), to the extent applicable, and shall be interpreted to avoid any penalty sanctions under Section 409A.  Accordingly, all provisions herein, or incorporated by reference, shall be construed and interpreted to comply with Section 409A and, if necessary, any such provision shall be deemed amended to comply with Section 409A and regulations thereunder.  If any payment or benefit cannot be provided or made at the time specified herein without incurring sanctions under Section 409A, then such benefit or payment shall be provided in full at the earliest time thereafter when such sanctions will not be imposed.  All payments to be made upon a termination of employment under this Agreement that are deferred compensation subject to Section 409A may only be made upon a "separation from service" under Section 409A.  For purposes of Section 409A, each payment made under this Agreement shall be treated as a separate payment.  In no event may Employee, directly or indirectly, designate the calendar year of payment.

(b)     Payment Delay.  To the maximum extent permitted under Section 409A, the Severance Payment payable under this Agreement is intended to comply with the "short-term deferral exception" under Treas. Reg. §1.409A-1(b)(4), and any remaining amount is intended to comply with the "separation pay exception" under Treas. Reg. §1.409A-1(b)(9)(iii); provided, however, any amount payable to Employee during the six (6) month period following Employee's last day of employment with the Company that does not qualify within this exception and constitutes deferred compensation subject to the requirements of Section 409A shall hereinafter be referred to as the "Excess Amount."  If at the time of Employee's separation from service, the Company's (or any entity required to be aggregated with the Company under Section 409A) stock is publicly-traded on an established securities market or otherwise and Employee is a "specified employee" (as defined in Section 409A and determined in the sole discretion of the Company (or any successor thereto) in accordance with the Company's (or any successor thereto) "specified employee" determination policy), then the Company shall postpone the commencement of the payment of the portion of the Excess Amount that is payable within the six (6) month period following Employee's last day of employment with the Company (or any successor thereto) for six (6) months following Employee's last day of employment with the Company (or any successor thereto).  The delayed Excess Amount shall be paid in a lump sum to Employee within thirty (30) days following the date that is six (6) months following Employee's last day of employment with the Company (or any successor thereto) and any amounts payable after such six (6) month period shall be paid in accordance with its original schedule.  If Employee dies during such six (6) month period and prior to the payment of the portion of the Excess Amount that is required to be delayed on account of Section 409A, such Excess Amount shall be paid to the personal representative of Employee's estate within sixty (60) days after Employee's death.

(c)     Reimbursements.  All reimbursements provided under this Agreement shall be made or provided in accordance with the requirements of Section 409A, including, where applicable, the requirement that (i) any reimbursement is for expenses incurred during Employee's lifetime (or during a shorter period of time specified in this Agreement), (ii) the amount of expenses eligible for reimbursement during a calendar year may not affect the expenses eligible for reimbursement in any other calendar year, (iii) the reimbursement of an eligible expense will be made on or before the last day of the taxable year following the year in which the expense is incurred, and (iv) the right to reimbursement is not subject to liquidation or exchange for another benefit.

**5.**     **Certain Representations and Warranties of Employee**.  Employee represents and warrants that Employee is entering into this Agreement voluntarily and that Employee's employment hereunder and compliance with the terms and conditions of this Agreement will not conflict with, or result in a breach of, any agreement to which Employee is a party or by which Employee may be bound, or any legal duty that Employee owes or may owe to another.

**6.**     **Restrictive Covenants**.

(a)     Employee acknowledges that during Employee's employment with the Company, Employee will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to the Company, the Company's subsidiaries and their Affiliates that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists or other business documents which the Company treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, "Confidential Information"). In addition, Employee acknowledges that: (i) the Company, the Company's subsidiaries and/or their Affiliates have invested, and continue to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company, the Company's subsidiaries and their Affiliates with a competitive advantage over others in the marketplace; and (iii) the Company, the Company's subsidiaries and their Affiliates would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public. Without limiting the applicability of any other agreement to which Employee is subject, Employee shall not, directly or indirectly, disclose or use (other than solely for the purposes of Employee monitoring and analyzing Employee's investment in the Company or performing Employee's duties as a manager, officer, employee, consultant or other service provider of the Company) at any time, including, without limitation, use for personal, commercial or proprietary advantage or profit, either during Employee's association or employment with the Company, the Company's subsidiaries and their Affiliates or thereafter, any Confidential Information of which Employee is or becomes aware. Employee in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss and theft.

(b)     Nothing contained in this **Section 6** shall prevent Employee from disclosing Confidential Information: (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over Employee; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests; and (iv) to the extent necessary in connection with the exercise of any remedy hereunder; *provided*, that in the case of clause (i), (ii) or (iii), Employee shall notify the Company of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

(c)     In light of Employee's access to Confidential Information and position of trust and confidence with the Company, Employee hereby agrees that, during Employee's employment and for a period of one (1) year following such termination (the "Restricted Period"), Employee shall not, and shall not permit any of Employee's Affiliates to, directly or indirectly, (x) engage in or assist others in engaging in any Restricted Business (defined below), (y) have an interest in any Restricted Business in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant, or (z) intentionally interfere in any material respect with the business relationships (whether formed prior to or after the date of this Agreement) between the Company or any Company subsidiary and customers or suppliers of the Company or any Company subsidiary or cause, induce or encourage any material client,

customer, supplier or licensor of the Company or any Company subsidiary (including any existing or former client or customer of the Company or any Company subsidiary and any person that becomes a client or customer of the Company or any Company subsidiary during the Restricted Period), or any other person who has a material business relationship with the Company or any Company subsidiary, to terminate or modify any such relationship. Notwithstanding the foregoing, nothing shall prohibit Employee or any of Employee's Affiliates having a passive ownership interest of not more than four percent (4.0%) of any publicly-traded entity whose securities have been registered under the Securities Act or Section 12 of the Exchange Act, so long as neither Employee nor any of Employee's Affiliates participates in any way in the management, operation or control of such publicly-traded entity. "Restricted Business" means the business of providing cost containment services through medical bill review, a review and auditing process to correct errors and overcharges on hospital billings prior to payment, and reference based reimbursement, a PPO replacement or narrow networking strategy designed to lower the cost of healthcare for employers, in the United States.

(d) In light of Employee's access to Confidential Information and position of trust and confidence with the Company, Employee further agrees that, during Employee's employment and for the Restricted Period, Employee shall not, and shall not permit any of Employee's Affiliates to, directly or indirectly, hire or solicit any employee of the Company or any Company subsidiary, or person who was employed by the Company or any Company subsidiary during the Restricted Period, or encourage any such employee to leave such employment or hire any such employee who has left such employment.

(e) In light of Employee's access to Confidential Information and position of trust and confidence with the Company, Employee further agrees that, during the Restricted Period, Employee shall not, and shall not permit any of Employee's Affiliates to, directly or indirectly, (i) solicit or entice, or attempt to solicit or entice, any clients or customers of the Company or any Company subsidiary that Employee worked with or learned of during Employee's employment, for the provision of services competitive with those offered by the Company or any Company subsidiary, or (ii) make statements or representations, or otherwise communicate in writing, orally or otherwise, or take any action that are intended to disparage or be damaging to the Company or any of its Affiliates or any of its officers, directors, employees, businesses, or its or their reputations.

(f) If any court of competent jurisdiction determines that any of the covenants set forth in this **Section 6**, or any part thereof, is unenforceable because of the duration or geographic scope of such provision, such court shall have the power to modify any such unenforceable provision in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this **Section 6** or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by applicable law. The parties hereto expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them.

(g) Employee acknowledges that a breach of any of the covenants contained in this **Section 6** shall cause irreparable damage to the Company, the exact amount of which would be difficult to ascertain, and that the remedies at law for any such breach or threatened breach would be inadequate. Accordingly, Employee agrees that if Employee breaches or threatens to breach any of the covenants contained in this **Section 6**, in addition to any other remedy which may be available to the Company at law or in equity, the Company shall be entitled to (i) cease or withhold any payments and/or benefits due and payable to Employee pursuant to any Incentive Unit Grant Agreement or any other agreement between Employee and the Company that relates to Employee's capacity as an employee of the Company in excess of any such amounts payable in consideration for Employee's release of claims against the Company; provided, however, that for the avoidance of doubt, the Company's taking such action shall not eliminate any liability for wrongfully ceasing or withholding such payment or benefits; and/or (ii) institute and prosecute

proceedings in any court of competent jurisdiction for specific performance and injunctive relief to prevent the breach or any threatened breach thereof without bond or other security or a showing that monetary damages will not provide an adequate remedy. Employee agrees to disclose in advance the existence and terms of the restrictions and covenants contained in this **Section 6** to any employer or service recipient by whom Employee might be employed or retained during the period in which the covenants or restrictions apply.

(h) Employee understands that pursuant to the federal Defend Trade Secrets Act of 2016, Employee shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

(i) As mutually-agreed upon consideration for Employee's compliance with the post-employment non-compete covenants in Section 6(c), the Company will pay Employee for one year following termination of employment, on a pro rata basis, 50% of Employee's highest annualized base salary paid by the Company within the 2 years preceding the termination of employment, unless the Company provides Employee written notice within 10 business days of the termination of Employee's employment that is waiving its right to enforce those covenants. Under no circumstances will Employee be entitled to receive both the "garden leave" payment provided for in this Section 6(i) and the Severance Payment (rather, Employee will be entitled to at most one such set of payments).

7. **Invention Assignment**.

(a) Employee agrees to promptly and fully disclose to the Company any and all inventions, original works of authorship, findings, conclusions, data, discoveries, developments, concepts, improvements, trade secrets, patents or copyrights (collectively, "Inventions").

(b) Employee hereby assigns, transfers and conveys to the Company all of Employee's right, title and interest in and to any and all Inventions that Employee may solely or jointly conceive, develop or reduce to practice, or cause to be conceived, developed or reduced to practice, in the performance of the services under this Agreement or that result, to any extent, from the use of the Company's premises or property, including but not limited to all patent rights, copyrights, trademarks, know-how and trade secrets and rights to apply for the same. Upon request and at the expense of the Company, Employee shall execute and deliver any and all instruments and documents and take such other acts as may be necessary or desirable to document the assignment and transfer described in this **Section 7** or to enable the Company to secure the rights relating thereto.

(c) Notwithstanding anything to the contrary in this **Section 7**, Employee shall have no obligation to assign to the Company any Invention for which no equipment, supplies, facilities or Confidential Information was used and which was developed entirely on Employee's own time, unless (i) at the time of conception or reduction to practice the Invention relates to the business of the Company or any Company subsidiary, (ii) at the time of conception or reduction to practice the Invention relates to actual or demonstrably anticipated research or development work of the Company or any Company subsidiary, or (iii) the Invention results from any work performed by Employee for the Company or any Company subsidiary.

(d) Employee hereby represents and warrants that as of the date of the execution of this Agreement, Employee does not have any rights in any Invention.

**8.** **Notices**.  For the purposes of this Agreement, any notice or demand hereunder to or upon any party hereto required or permitted to be given or made shall be deemed to have been duly given or made for all purposes if (a) in writing and sent by (i) messenger or an overnight courier service, or (ii) certified or registered mail, postage paid, return receipt requested, or (b) sent by telefax, telex, an attachment to an electronic mail message in "pdf" or similar format, or similar electronic means (if sent by telefax, telex, "pdf" or similar format or electronic means, to be promptly followed by notice by messenger or overnight courier service), to such party at the following address:

> In the case of Employee, to Employee at:
>
>> Laura A. Conte
>> 20 Spindletree Road
>> Amesbury, MA 01913
>
> or at the last known address of Employee contained in the personnel records of the Company.
>
> In the case of the Company, to it at:
>
>> Anasazi Medical Payment Solutions, Inc.
>> 420 Technology Parkway, Suite 200
>> Norcross, GA 30092

or, in the case of either party, as applicable, to such other names or addresses as the Company or Employee, as the case may be, shall designate by notice to each other person entitled to receive notices in the manner specified in this Section.

**9.** **Severability; Assignment**.

(a) If any portion of this Agreement is held invalid or unenforceable by a court of competent jurisdiction, such portion shall be deemed deleted as though it had never been included herein, but the remainder of this Agreement shall remain in full force and effect.

(b) This Agreement (i) shall not be assignable by Employee without the prior written consent of the Company except pursuant to the laws of descent and distribution and then only for purposes of enforcing Employee's rights under **Section 4** and (ii) shall be assignable by the Company only with the consent of Employee, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that the Company may assign its rights and obligations under this Agreement without consent of Employee in the event that the Company shall effect a reorganization or consolidate or merge with, sell all or substantially all of its equity or assets to, or enter into any other similar transaction with, any other entity, including, without limitation, its rights under **Section 6** (Restrictive Covenants) and **Section 7** (Invention Assignment).

**10.** **Cooperation With Regard to Litigation.** Employee agrees to cooperate with the Company during the term of this Agreement and thereafter (including following Employee's termination of employment for any reason) by making himself or herself reasonably available to testify on behalf of the Company or its Affiliates, in any action, suit or proceeding, whether civil, criminal, administrative, or investigative, and to assist the Company or any of its Affiliates in any such action, suit, or proceeding by providing information and meeting and consulting with its counsel and representatives (other than in connection with any action, suit or proceeding in which Employee is adverse to the Company or its Affiliates).  Employee shall be fully

reimbursed for any out-of-pocket expenses reasonably incurred by Employee in the course of such cooperation.

**11.     No Waiver**.  The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver of such party's rights or deprive such party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

**12.     Successors; Binding Agreement**.  This Agreement shall inure to the benefit of and be binding upon the Company, its successors and permitted assigns.  This Agreement shall also inure to the benefit of and be binding upon Employee, Employee's executors, administrators and heirs.

**13.     Governing Law; Venue**.  This Agreement shall be governed by and construed in accordance with, the laws of the Commonwealth of Massachusetts without regard to conflict or choice of law provisions or rules that would defer to the substantive laws of another jurisdiction.  Any suit or proceeding arising from the subject matter of this Agreement shall only be brought in federal court in Boston, Massachusetts. The parties agree that such venue is appropriate and waive any and all rights to contest the exclusive personal jurisdiction and venue of such court.

**14.     No Third Party Beneficiaries**.  Nothing contained in this Agreement, whether express or implied, is intended, or shall be deemed, to create or confer any right, interest or remedy for the benefit of any person other than as otherwise provided in this Agreement.

**15.     Entire Agreement**.  This Agreement and any Separation Release executed pursuant to **Section 2(b)** of this Agreement supersede all prior employment or other agreements, negotiations or understandings of any kind with respect to the subject matter hereof and contain the entire understanding between the parties hereto with respect to the subject matter hereof.  Any representation, premise or condition, whether written or oral, not specifically incorporated herein, shall have no binding effect upon the parties.

**16.     Headings**.  The headings contained in this Agreement are included for convenience and reference purposes only and shall be given no effect in the construction or interpretation of this Agreement.

**17.     Amendments**.  No modification, termination or waiver of any provision of this Agreement shall be valid unless it is in writing and signed by the party against whom the same is sought to be enforced.

**18.     Survival**.  To the extent consistent with their terms, the covenants in **Sections 2, 3, 4, 6, 7, 9, 10, 11, 13 and 18** hereof shall survive the termination or expiration of this Agreement and the termination of Employee's employment hereunder.

**19.     Counterparts**.  This Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

**20.     Acknowledgements.**  Employee acknowledges that (a) Employee has the right to consult with counsel prior to signing this Agreement and (b) Employee has had a full and adequate opportunity to read, understand and discuss with Employee's advisors, including counsel, the terms and conditions contained in this Agreement prior to signing hereunder.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**EMPLOYEE**

*DocuSigned by:*
*Laura Conte*
11B79E7537FE48B...
Laura Conte
Chief Legal Officer

**ANASAZI MEDICAL PAYMENT SOLUTIONS, INC.**

By: _____
Name:   Kirk Fallbacher
Title:      President and CEO

[Signature Page to Employment Agreement]