**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LAURA CONTE,                                           : | |
|                                                        : | |
|         Plaintiff,                                     : | C.A. No.:  1:24-cv-10605-WGY |
|                                                        : | |
| v.                                                     : | |
|                                                        : | |
| ANASAZI MEDICAL PAYMENT                                : | |
| SOLUTIONS INC. D/B/A ADVANCED                          : | |
| MEDICAL PRICING SOLUTIONS                              : | |
| ("AMPS");                                              : | |
|                                                        : | |
| CIMARRON HEALTHCARE CAPITAL;   : | |
|                                                        : | |
| JAMES NADAULD.                                         : | |
|                                                        : | |
|                                                        : | |
|         Defendants.                                    : | |

**MOVING PARTY CONTE'S MEMORANDUM IN SUPPORT OF HER SPECIAL MOTION TO DISMISS NON-MOVING PARTY ANASAZI MEDICAL PAYMENT SOLUTIONS, INC. D/B/A ADVANCED MEDICAL PRICING SOLUTIONS' COUNTERCLAIM ON THE BASIS THAT IT VIOLATES M.G.L. c. 231 s. 59H, MASSACHUSETTS' "ANTI-SLAPP" STATUTE**

Moving Party Conte moves this Court to dismiss Non-Moving Party  Anasazi Medical

Payment Solutions, Inc., d/b/a Advanced Medical Pricing Solutions, ("AMPS"), counterclaim

because it violates M.G.L. c. 231 s. 59H, Massachusetts' Anti-SLAPP statute.  The purpose of

Non-Moving Party  AMPS's counterclaim is to retaliate against Moving Party Conte for

pursuing this litigation and to attempt to gain leverage.

1. Moving Party Conte filed a Charge of Discrimination with the Massachusetts Commission

    Against Discrimination, ("MCAD"), regarding the allegations in this case on October 16,

    2023.  (Please see Exhibit 1.)

2. On November 3, 2023, Moving Party Conte's counsel emailed to AMPS's Chief Executive Officer, Mr. Matthew Brow, Moving Party Conte's filed Charge of Discrimination, a draft of Moving Party Conte's federal complaint and the settlement demand. Id.

3. The substance of the draft of the federal complaint sent to CEO Brow on November 3, 2023 is nearly identical to the substance of the Complaint filed with this Court; the language in the Complaint filed with this Court was merely re-arranged or revised. Id.

4. The draft of the federal complaint sent to CEO Brow included Moving Party Conte's multiple citations to the Employment Agreement, referenced as Exhibit 1 to the Complaint, which put him on notice that Moving Party Conte intended to incorporate the Employment Contract into the Complaint. Id.

5. On or before November 7, 2023, I had a phone conversation with then counsel for AMPS.

6. During the call, defense counsel broached the topic of settlement and acknowledged that he had received the draft of the federal complaint I had sent to CEO Brow.

7. As of November 7, 2023, defense counsel was also on notice that Moving Party Conte intended to incorporate the Employment Agreement into the complaint.

8. The parties scheduled a mediation for January 25, 2024, but AMPS requested a continuance due to its retention of successor counsel. Id.

9. The parties attended two days of mediation on April 22 and May 30, 2024. Id.

10. Attending a third day of mediation was discussed, but the parties could not agree on the terms and efforts to mediate ceased. Id.

11. On June 14, 2024, Non-Moving Party AMPS filed its Answer to Moving Party Conte's Complaint and included a Counterclaim for Breach of Contract, alleging that Moving Party Conte's inclusion of the Employment Agreement in the Complaint was in and of itself a

Breach of Contract, and that the substance of Moving Party Conte's Complaint was also a Breach of Contract because the Complaint divulged unspecified "Confidential" and/or "Proprietary Information". (Docket No. 10.)

12. On June 14, 2024, Non-Moving Party AMPS filed its Answer to Moving Party Conte's Complaint and included a Counterclaim for Breach of Contract which alleged that Moving Party Conte's incorporation of the Employment Agreement in the Complaint was in and of itself a Breach of Contract, and that the substance of Moving Party Conte's Complaint was also a Breach of Contract because the Complaint divulged unspecified "Confidential" and/or "Proprietary Information". (Docket No. 10, Exhibit 1.)

13. Non-Moving Party AMPS's counterclaim fails to include *even one* specific fact in the Complaint to support its allegations that Moving Party Conte's Complaint disclosed "Confidential Information", "information relating to trade secrets, proprietary information or other confidential information" or an explanation of any harm which was suffered. (Docket No. 10.)

14. At no time between November 3, 2023, when Non-Moving Party AMPS was on notice that Moving Party Conte intended to incorporate the Employment Agreement into the Complaint, and June 14, 2024, did either of the two defense firms representing Non-Moving Party AMPS ever broach the topics with Moving Party Conte's counsel of concern that the Employment Agreement had been incorporated into the Complaint or their alleged position that there had been a disclosure of confidential or proprietary information. (Please see Exhibit 1.)

15. At no time between November 3, 2023 and June 14, 2024 did either of Non-Moving Party AMPS's attorneys request that the Complaint be sealed. Id.

<u>Applicable Law:</u>

The purpose of the anti-SLAPP statute is to protect the right to petition under the Massachusetts and United States Constitution from the burden of meritless lawsuits. <u>Steinmetz v. Coyle and Caron, Inc.</u>, 2016 WL 4074135, *3 (2016).  The First Circuit has ruled that the Massachusetts anti-SLAPP statute, M.G.L. c. 231 s. 59H, is substantive and is properly before First Circuit federal courts considering cases involving state claims. <u>Godin v. Shenks</u>, 629 F.3d 79, 88-89 (1st Cir. 2010); <u>Steinmetz v. Coyle and Caron, Inc.</u>, 2016 WL 4074135, *3 (2016); <u>Hi-Tech Pharmaceuticals, Inc. v. Cohen</u>, 208 F.Supp.3d 350, 352 (2016).

In any case in which a party asserts that the civil claims, counterclaims, or cross claims against said party are based on said party's exercise of its right of petition under the constitution of the United States or of the Commonwealth, said party may bring a special motion to dismiss. M.G.L. c. 231 s. 59H.

The burden-shifting standard for a special motion to dismiss pursuant to the anti-SLAPP statute is well-established. <u>Steinmetz v. Coyle and Caron, Inc.</u>, 2016 WL 4074135, *6 *citing* <u>Town of Hanover v. New England Reg'l Council of Carpenters</u>, 467 Mass. 587, 595 (2014), (citing Mass. Gen. L. c. 231, § 59H).

First, the party seeking the protection of the anti-SLAPP statute must present pleadings and affidavits that provide a threshold showing that the claims against the party moving for dismissal are based exclusively upon that party's petitioning activities. <u>Id.</u>  Petitioning activities include any written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding. <u>Hi-Tech Pharmaceuticals, Inc.</u>, 208 F.Supp.3d at 352, *citing* M.G.L. c. 231 s. 59H.  The anti-SLAPP statute protects moving parties from lawsuits that are

based on moving parties' activities directly related to ongoing litigation. Fabre v. Walton, 436 Mass. 517 (2002); Powell v. Stevens, 69 Mass. App. Ct. 87, n. 6 (2007). Administrative and legal actions constitute "quintessential petitioning activity". Bristol Asphalt Co., Inc. v. Rochester Bituminous Products, Inc., 493 Mass. 539, 562 (2024).

Thereafter, the claims are subject to dismissal unless the nonmoving party can establish by a preponderance of the evidence that the moving party's petitioning activity was devoid of any reasonable factual support or any arguable basis in law and its actions caused actual injury[1]. Bristol Asphalt Co., Inc., 493 Mass. at 557 (2024); Steinmetz, 2016 WL 4074135, *6. (Emphasis added). Proving petitioning is devoid of any reasonable factual support or any arguable basis in law is very difficult. Bristol Asphalt Co., Inc., 493 Mass. at 557. Mere submission of opposing affidavits submitted by the Non-Moving Party does not establish that the petitioning activity is devoid of any reasonable factual support or any arguable basis in law. Id., at 558. The critical determination is not whether the petitioning activity in question will be successful, but rather whether it contains any reasonable factual or legal merit at all. Wenger v. Aceto, 451 Mass. 1, 7 (2008). In the context of an Anti-SLAPP motion, to demonstrate that a claim is devoid of any arguable basis in law it is not enough for the [Non-Moving Party] to show that the [Moving Party's] alleged petitioning activity was based on an error of law, he must show that no reasonable person could conclude that there was a basis in law for the petitioning activity. Id.

---

[1] While there appears to be disagreement among some federal courts regarding whether the Non-Moving Party should be subject to the second half of the second prong, establishing that the Moving Party's actions caused actual injury to the Non-Moving Party, all courts agree that to survive a Special Motion to Dismiss brought under M.G.L. c. 231 s. 59H, at a minimum, the non-moving party must make a showing that the defendant's petitioning conduct lacked a reasonable basis in law or fact. Hi-Tech Pharmaceuticals, Inc., 208 F.Supp.3d at 356.

Argument:

Non-Moving Party AMPS filed its counterclaim, consisting of one sole count of Breach of Contract, in a patent attempt to retaliate against Moving Party Conte because she has chosen to assert her rights and pursue this litigation.

Non-Moving Party AMPS has known that Moving Party Conte intended to include the Employment Agreement in the Complaint since November 3, 2023.  Non-Moving Party AMPS never once contacted Ms. Conte's counsel to express concern about the incorporation of the Employment Agreement into the Complaint or that potential confidential or proprietary information was being disclosed or to request that Moving Party Conte seal the Complaint.

The parties mediated this case for two days and discussed mediating for a third.  When efforts to mediate failed, Non-Moving Party AMPS filed its counterclaim.  Moving Party Conte's assertion that Non-Moving Party AMPS's filing of its counterclaim is solely based on retaliation for pursuing this litigation is supported by the utter lack of any factual support for Non-Moving Party AMPS's Breach of Contract claim.  Non-Moving Party AMPS has merely regurgitated the elements of the claim without inserting even one specific action or omission of Moving Party Conte to support it.

1. <u>Moving Party Conte Has Met the Required Showings Necessary For an Anti-SLAPP Special Dismissal and This Court Should Dismiss The Counterclaim.</u>

   A. <u>Moving Party Conte Has Established That She Engaged In Petitioning Activity.</u>

   Moving Party Conte filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination, a state government administrative agency, and then a complaint with this Court alleging gender discrimination and unequal pay because of gender.  As stated supra, petitioning activity includes statements made to a government or

judicial body and includes activities directly related to ongoing litigation and administrative and judicial actions are "quintessential petitioning activity".  Moving Party Conte has established that she engaged in Petitioning Activity.

B.      Non-Moving Party AMPS's Claims Are Subject to Dismissal Because It Cannot Make a Showing that Moving-Party Conte's Petitioning Activity Was Devoid of Any Reasonable Factual Support or Any Arguable Basis In Law.

Proving petitioning activity is **devoid** of *any* reasonable factual support or *any* arguable basis in law is very difficult. The burden is on Non-Moving Party  AMPS to show that ***no reasonable person*** could conclude that there was any factual support or a basis in law for Moving Party Conte's petitioning activity.  Non-Moving Party  AMPS will be unable to establish this.

Moving Party Conte's Complaint is replete with facts illustrating, in very specific detail, the disparate treatment of her based on her gender, the preferential and more favorable treatment the males received in the workplace, including but not limited to in terms of salary, bonuses and equity, the hostile work environment created by AMPS et al. and the retaliation against her after she complained of the disparate treatment on the basis of gender.

Furthermore, Moving Party Conte's claims in her Complaint are firmly rooted in the law.  The Massachusetts Anti-Discrimination Statute and Equal Pay Statute are narrowly tailored to address precisely the scenario described in Moving Party Conte's Complaint.

Non-Moving Party  AMPS cannot establish that no reasonable person could conclude that there was any factual support or basis in law for Moving Party Conte's petitioning activity.

C.    <u>Non-Moving Party AMPS's Claims Are Subject to Dismissal Because It Cannot Make a Showing that Moving-Party Conte's Petitioning Activity Caused Actual Injury.</u>

Non-Moving Party  AMPS cannot establish that it has suffered any injury as a result of Moving-Party Conte's proper and valid Petitioning Activity.

2.    <u>Non-Moving Party AMPS's Counterclaim Is Wholly Without Merit and Is Precisely the Type of Claim Of Which the Anti-SLAPP Statute Permits Dismissal.</u>

A.    <u>Non-Moving Party AMPS's Counterclaim Is Patently Without Merit.</u>

Non-Moving Party  AMPS's sole counterclaim, one count of Breach of Contract, is meritless and is precisely the type of claim that should be dismissed under the anti-SLAPP statute.  It utterly lacks any specific facts to support the claim.  There are no facts to illustrate which actions or omissions of Moving Party Conte constituted a breach of contract, what specifically in the Complaint constituted publication of "Confidential" or "Proprietary" information and why that information is either confidential or proprietary.  The counterclaim is, on its face, frivolous.

B.    <u>Non-Moving Party  AMPS's Counterclaim Is Patently Without Merit and Is An Overt Attempt to Intimidate Moving Party Conte and Cause Her to Withdraw the Instant Litigation.</u>

Non-Moving Party  AMPS, its officers and attorneys have known about Moving Party Conte's incorporation of the Employment Agreement into her complaint as early as November 3, 2023.  No representative of AMPS ever broached the subject with counsel for Moving Party Conte of concern over the Employment Agreement being incorporated into the Complaint or any confidential or proprietary information being published  or asked her to seal the Complaint.  The

8

first time AMPS ever brought this "concern" to light was after mediation failed, in a counterclaim.

3. <u>Moving Party Conte Requests This Court Award Moving Party Conte Attorney's Fees, Costs and Damages Related to Non-Moving Party  AMPS's Retaliatory Filing of Its Counterclaim.</u>

The Court may award Moving Party Conte fees, including attorney's fees, costs and damages incurred and suffered as a result of having to bring this Motion.  Moving Party Conte requests that this Court award her Attorney's fees, costs and damages related to this Motion.

4. <u>Conclusion:</u>

Moving Party Conte asks this Court to dismiss Non-Moving Party  AMPS's counterclaim <u>with prejudice</u> and award Moving Party Conte fees, including attorney's fees, costs and damages relating to this Motion.

**Respectfully submitted,**
**Moving Party,**
**LAURA CONTE**
By her attorney,

*/s/ Allison MacLellan*

_____
Allison MacLellan, BBO No. 654586
MacLellan Law Firm
377 Willard Street, #236
Quincy, MA 02169
Telephone:  (617) 980-5999
amaclellan@maclellanlawfirm.com

Dated:  June 21, 2024

9

# Exhibit 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

LAURA CONTE,                                              :
                                                         :
      Plaintiff,                                 :      C.A. No.:  1:24-cv-10605-WGY
                                                         :
v.                                                       :
                                                         :
ANASAZI MEDICAL PAYMENT                                   :
SOLUTIONS INC. D/B/A ADVANCED                             :
MEDICAL PRICING SOLUTIONS                                 :
("AMPS");                                                 :
                                                         :
CIMARRON HEALTHCARE CAPITAL;                              :
                                                         :
JAMES NADAULD.                                            :
                                                         :
                                                         :
      Defendants.                                :

## AFFIDAVIT OF ALLISON MACLELLAN, ESQ.

Now comes ALLISON MACLELLAN, under oath, and hereby deposes and states as follows:

1. I am an attorney in good standing with the Commonwealth of Massachusetts and I represent the Plaintiff, Laura Conte.

2. Plaintiff filed a Charge of Discrimination in this case on October 16, 2023.

3. On November 3, 2023, I emailed the Chief Executive Officer of Defendant Anasazi Medical Payment Solutions, Inc., d/b/a Advanced Medical Pricing Solutions, ("AMPS"), the Charge of Discrimination Plaintiff filed with the Massachusetts Commission Against Discrimination, ("MCAD"), a draft of the Plaintiff's federal complaint and a settlement demand.  (Please see Exhibit A, in relevant part (Exhibit A omits the Settlement Demand and the MCAD Charge which were also attached to the email to CEO Brow).

4. The draft of the federal complaint I sent to CEO Brow on November 3, 2023 is in substance almost identical to the Complaint filed with this Court, the finalized language was merely re-arranged or rephrased.

5. The draft of the federal complaint sent to CEO Brow included Plaintiff's multiple citations to the Employment Agreement, referenced as Exhibit 1 to the Complaint, which put him on notice that Plaintiff intended to incorporate the Employment Contract into the Complaint.

6. On or before November 7, 2023, I had a phone conversation with then counsel for Defendants.

7. During the call, defense counsel broached the topic of settlement and acknowledged that he had received the draft of the federal complaint I had sent to CEO Brow.

8. As of November 7, 2023, defense counsel was also on notice that Plaintiff intended to incorporate the Employment Agreement into the complaint.

9. The parties scheduled a mediation for January 25, 2024, but Defendants requested a continuance due to their retention of successor counsel.

10. The parties attended two days of mediation on April 22 and May 30, 2024.

11. Attending a third day of mediation was discussed, but the parties could not agree on the terms and efforts to mediate ceased.

12. On June 14, 2024, Defendant AMPS filed its Answer to Plaintiff's Complaint and included a Counterclaim for Breach of Contract which alleged that Plaintiff's incorporation of the Employment Agreement in the Complaint was in and of itself a Breach of Contract, and that the substance of Plaintiff's Complaint was also a Breach of Contract because the Complaint divulged unspecified "Confidential" and/or "Proprietary Information".

13. Defendant AMPS's counterclaim fails to include *even one* specific fact in the Complaint to support its allegations that Plaintiff's Complaint disclosed "Confidential Information", "information relating to trade secrets, proprietary information or other confidential information" or an explanation of any harm which was suffered.

14. At no time between November 3, 2023, when Defendant AMPS was on notice that Plaintiff intended to incorporate the Employment Agreement into the Complaint, and June 14, 2024, did either of the two defense firms representing Defendant AMPS ever broach the topics with Plaintiff's counsel of concern that the Employment Agreement had been incorporated into the Complaint or their alleged position that there had been a disclosure of confidential or proprietary information.

15. At no time between November 3, 2023 and June 14, 2024 did either of Defendant AMPS's attorneys request that the Complaint be sealed.


Signed under the penalties of perjury this 21st day of June, 2024.


_____

ALLISON MACLELLAN

# Exhibit A

## Laura Conte v. AMPS, Cimarron Healthcare Capital and James Nadauld, 23 BEM 2926

### Allison MacLellan <amaclellan@maclellanlawfirm.com>

Fri 11/3/2023 6:22 PM

To:mbrow@amps.com <mbrow@amps.com>

📎 3 attachments (3 MB)

Demand.pdf; CHARGE OF DISCRIMINATION Final.pdf; Conte Federal Complaint.pdf;

**Good Evening Mr. Brow,**

Please be advised that this office represents Ms. Conte in a lawsuit against AMPS, Cimarron and Mr. Nadauld.

Please forward the attached to your attorneys and ask them to call me.

Sincerely,
Allison MacLellan, Esq.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LAURA CONTE, | : | |
| | : | |
| Plaintiff, | : | C.A. No.: |
| | : | |
| v. | : | **Jury Trial is Demanded** |
| | : | |
| ANASAZI MEDICAL PAYMENT | : | |
| SOLUTIONS INC. D/B/A ADVANCED | : | |
| MEDICAL PRICING SOLUTIONS | : | |
| ("AMPS"); | : | |
| | : | |
| CIMARRON HEALTHCARE CAPITAL; | : | |
| | : | |
| JAMES NADAULD. | : | |
| | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT AND JURY DEMAND

The plaintiff, Laura Conte, by and through her undersigned counsel, complaining of the defendants alleges and avers as follows:

1. The plaintiff, Laura Conte, is an individual and resident of Amesbury in the Commonwealth of Massachusetts.

2. At all times material hereto, Ms. Conte was an employee of Defendant Anasazi Medical Payment Solutions, Inc. d/b/a Advanced Medical Pricing Solutions, ("AMPS"), which was owned by Defendant Cimarron Healthcare Capital, ("Cimarron"), and performed her work in the Commonwealth of Massachusetts.

3. Defendant AMPS was, at all times material hereto, a foreign company with a principal place of business at 2700 North Central Avenue, Phoenix, AZ.

4.      Defendant Cimarron Healthcare Capital was, at all times material hereto, a foreign company with a principal place of business at 6440 S. Wasatch Blvd. Suite 380, Salt Lake City, UT 84121.

5.      Defendant James Nadauld is an individual who at all times relevant to this Complaint resided in Utah.

## JURISDICTION, VENUE AND CHOICE OF LAW

6.      Jurisdiction is proper pursuant to 28 U.S.C. 1332 as there is complete diversity between the plaintiff and the defendants and the amount in controversy exceeds $75,000.00.

7.      Venue is proper pursuant to 28 U.S.C. 1391(b)(2), because the parties entered into a contract governing Plaintiff's employment and disputes arising therefrom and agreed that the venue for any lawsuit arising out of Plaintiff's employment will be filed in federal court in Boston, Massachusetts. (Please see Exhibit 1, para. 13, attached hereto.)

8.      The parties contracted that Massachusetts law governs disputes regarding Plaintiff's employment with AMPS.  (Id.)

## FACTS

9.      At all times material hereto, Laura Conte was an employee of Defendant AMPS.

10.     Ms. Conte performed her job in a stellar manner throughout her employment.

11.     Ms. Conte is female.

12.     At all times relevant to this complaint, Defendant Nadauld and all persons holding the positions of CEO, COO, CFO and CRO were male.

13.     Defendant AMPS provides healthcare cost containment services to the payer community.

14.     Defendant Cimarron is a private equity firm with the majority holding in Defendant AMPS; Defendant Cimarron is the parent company of AMPS.

2

15.     Defendant Nadauld is the Founder and Managing Partner of Cimarron and is the Chairman of the Board of Directors of Cimarron.

16.     Defendants Cimarron and Nadauld retained and exercised pervasive control over the daily operations and decision making at AMPS.

17.     The Employment Agreement states that the amount and criteria regarding Plaintiff's bonus will be determined by the Board of Directors or AMPS's "ultimate parent entity", Cimarron.

18.     Defendants Cimarron and Nadauld directed and controlled AMPS and used it for an improper purpose – gender discrimination.

19.     This intercorporate relationship caused injury to Ms. Conte. Defendants Nadauld and Cimarron directly caused Plaintiff to receive less compensation than her male comparators despite her performing the work of her comparators, caused her to work in a hostile work environment and caused her to suffer from degradation, humiliation and emotional distress.

20.     Plaintiff was hired as the General Counsel of AMPS on January 20, 2020, at a salary of $200,000.

21.     General Counsel, the Chief Financial Officer, ("CFO") , the Chief Revenue Officer, ("CRO") and the Chief Operating Officer, ("COO") were all hired at AMPS within 6 months of each other.

22.     Plaintiff was promoted to Chief Legal Officer, ("CLO") in March 2021 and was given a $35,000 raise totaling $235,000 in salary and equity in two parts, the first will be fully vested on April  30, 2025 and the second will be fully vested on July 25, 2026.

3

23.    The positions of both General Counsel and Chief Legal Officer at AMPS are seated in the "C Suite", the corporate executive offices, on the same level as the Chief Financial Officer, ("CFO"), Chief Revenue Officer, ("CRO") and Chief Operating Officer, ("COO").

24.    The C Suite was also referred to by AMPS as the Senior Leadership Team, ("SLT").  For all times relevant to this Charge, Ms. Conte was the only female on the Senior Leadership Team.

25.    Cimarron directed the C Suite to grow AMPS.

26.    After the C suite was assembled, every member of the C suite did all jobs necessary to grow the company regardless of his or her title or the nature of the work.

27.    To that end, AMPS directed all of the C suite, including Plaintiff, to sell business, hire employees and grow the business.

28.    The entire C suite, including Plaintiff, interviewed candidates, created and built departments and engaged in sales.

29.    Plaintiff had extensive experience in insurance,  specifically in the ERISA market; she had worked in this industry since 1980.

30.    She brought forty years' insurance experience to AMPS and has always had significantly more experience than the male members of the C Suite.  Both AMPS's former CEO, Kirk Fallbacher, and AMPS's current COO, Jonathon Jeffress, have backgrounds in software.  Both the current CRO, Jeff Zevada, and the current CEO, Matt Brow, had zero experience at the time of hire and to date neither has improved upon that experience to any noticeable degree.

31.    Plaintiff had managerial responsibilities and functions equal to those of the males in the C Suite with her, including the COO and the CRO.

32.    The CLO, COO and CRO all managed a team of employees, conducted annual performance reviews, recommended raises to the CEO who submitted the recommendations to

4

Cimarron's Board of Directors, presented to Cimarron's Board of Directors regarding the health of AMPS on a quarterly basis and attended weekly Senior Leadership Team meetings to review the company's health from top to bottom.  During these weekly SLT meetings, all C Suite members, regardless of title, were responsible for  brainstorming and collaborating on how to build business and meet Cimarron's Board's ever-present directive to increase revenue.

33.    As CLO, Plaintiff also drafted and reviewed all service, provider and business contracts, managed outside counsel, analyzed acquisitions and performed due diligence.

34.    In addition, at the CEO's request, Plaintiff assumed oversight of an external Human Resources company which performed the outsourced functions of a Human Resources Department for AMPS after the CFO, who had been overseeing the department, left AMPS and was not replaced.

35.    Because Plaintiff has such extensive insurance experience and because the men who have held the positions of CRO and COO have had virtually none, AMPS routinely asked Plaintiff to perform the duties of the CRO and COO in addition to her own duties as CLO.

36.    Plaintiff was performing work requiring comparable skill, effort and responsibility as the CRO and COO of AMPS under similar working conditions.

37.    In fact, Plaintiff was performing the *actual duties* of the CRO and COO; she was doing the substance of their jobs in addition to her job as CLO.

38.    The parties' Employment Contract states the Plaintiff's duties as CLO could be changed "to meet the Company's business goals." (Ex. 1, Para. 1(a).)

39.    Regarding the CRO, the specific duties of the position  fall into two categories: sales and account management.

5

40.    Sales involves, as the name suggests, selling AMPS's services to new clients.  AMPS's sales consist of three client categories: 1) Healthshares, which constitute approximately 2% of AMPS's sales, 2) Self-funded ERISAs which constitute approximately 80% of AMPS's sales, and 3) "Non-standard" sales which constitute approximately 15% of AMPS's sales.

41.    The CRO position was filled in 2020 and the CRO served until September 2022.   The CRO had experience as an insurance benefit consultant, but he lacked experience in the vendor space which AMPS serviced.

42.    As a result of the CRO's lack of experience, he had to ask Plaintiff to perform the duties of his job with respect to *all sales* AMPS targeted, including and predominantly ERISAs.  He asked Plaintiff, the CLO, to travel to client sales meetings and present the sales pitches to prospective clients and close the deals. The CRO also asked Plaintiff to develop sales strategies for sales efforts with prospective clients, leverage potential referrals and partnerships to provide strong channels of new revenue (for which he would be paid the commissions), train his sales team on all AMPS services they were responsible for selling, train his Account Management team on client satisfaction and how to upsell other services to active clients to increase AMPS's revenue and work closely with the CRO's Account Management Team for implementation of the training and to answer questions and provide guidance.

43.    In addition, AMPS's CEO asked Plaintiff to work with him directly to expand sales, duties which were unequivocally the responsibility of the CRO - who was not involved in the efforts of the CEO and Plaintiff to expand sales.

44.    Throughout her employment, Plaintiff and the CEO sold 100% of the Healthshare services for which Plaintiff received no compensation or commission.

45.    The CRO had no involvement in the sale of the Healthshares, but upon information and belief, received the commissions on Plaintiff's sales.

46.    Non-standard sales involved attempts to venture into new sectors AMPS was not already involved in to create a new area of business for AMPS.  This would most often require AMPS's CRO and COO to create new infrastructure and operations to support the non-standard client. The CRO however, was not experienced in this area and did not understand what type of services were compatible with AMPS's business model.  As such, the CRO involved Plaintiff in every single attempted sale in this non-standard area of sales and repeatedly asked Plaintiff to research if the area was viable and how AMPS could make it work, which was his job.

47.    Each time the CRO suggested that AMPS sell services to a non-standard client, Plaintiff told the CRO and the COO that it would require both of them to create a plan to build the requisite new infrastructure and design new operations to support the new non-standard client and then they would have to implement the plan.

48.    In response to Plaintiff pointing out that it was their job as CRO and COO to create a plan and implement it, they both responded that they "didn't know" how to build policies and procedures regarding the non-standard services and/or the services themselves and they asked Plaintiff to do it, despite it being squarely within both of their job descriptions.

49.    Upon information and belief, the CRO received commissions on these non-standard sales which Plaintiff made possible.

50.    At AMPS's request, Plaintiff pitched and closed sales, and AMPS paid 100% of the commissions for Plaintiff's sales to her male colleagues whose job she performed.

7

51.     The second area of responsibility of the CRO, account management, involved overseeing the account managers who managed the client accounts.  The duties of the account managers included upselling services to existing clients and fielding and resolving customer complaints.

52.     Because the CRO lacked the requisite experience and knowledge regarding the services he was responsible for selling, he was unable to train his sales staff on the services, he was unable to train his account management staff on how to upsell or respond to customer complaints regarding AMPS services.

53.     He was unable to respond to clients directly regarding their complaints which had been escalated to him by his staff and/or the Clients themselves.

54.     The CRO did not understand the substance of the client complaints and was therefore wholly incapable of de-escalating the situation and providing guidance to the clients.  For this, he relied on Plaintiff.

55.     The subordinates of the CRO all came to Plaintiff for training, questions and guidance on how to perform their jobs.

56.     Plaintiff, at the request of AMPS's CEO, trained the CRO's sales staff and the account management staff on the services AMPS sold, how to makes sales and upsell to existing clients, and how to handle customer complaints.

57.     The CRO's inability to perform the duties of his own job was to such a degree that the CEO asked Plaintiff to officially oversee the account management department for 5 months in 2022.  For no additional pay.

58.     The CRO earned $450,000 per year in base salary and a minimum of $100,000 in bonus plus yearly sales commissions approximated at $50,000 per year, totaling a yearly compensation package of $600,000.

59.     The CRO remarkably earned $450,000 more than Plaintiff who was doing his job.

60.     Circa January of 2023, AMPS hired a separate person with the newly created title of Vice President of Account Management to manage the CRO's Account Management Department.

61.     The COO also lacked the requisite knowledge and experience to perform his job and asked Plaintiff to conduct the duties of his job.

62.     Once the client has signed on with AMPS, it becomes the responsibility of the COO and his Operations Department to administer the client's account from an operations standpoint and service the client's needs throughout the entirety of the client's time with AMPS.

63.     The COO is responsible for overseeing operational management of the Advocacy, Implementation and Business Development teams, managing system integrity and developing strategic relationships with clients.  Plaintiff performed these duties for the COO because he did not know how.

64.     Plaintiff, at the request of COO and CEO, has provided training to the COO's staff, provided oversight of operations, developed processes and procedures as necessary to ensure implementation of services, developed client enhancements and due diligence investigations on client operational issues - all squarely within the job description of the COO.

65.     Plaintiff was also asked by the CEO to handle all client complaints relative to system errors, member dissatisfaction, network development and implementation, onboarding of clients and other operational duties. All duties of the COO.

66.     COO Jeffress earns $300,000 in base salary per year and is paid a $100,000 bonus per year.

67.     Because of her gender, Plaintiff was paid less salary than her male comparators, was excluded from financial deals for which her male comparators were paid - regardless of their

9

involvement in the deal, and was *never* paid a bonus despite her male comparators being paid large bonuses every year.

68.    Throughout her employment, Defendants, especially Defendant Nadauld, routinely excluded Plaintiff from projects and deals in which the CLO categorically should have been involved.  This prevented her from doing her job, created an impression that she did not need to be respected in the workplace and excluded her from compensation from the deals for which her male colleagues were compensated regardless of their contribution.

69.    For example, on April 8, 2021, AMPS and Defendant Nadauld excluded Plaintiff, because of her gender, from involvement in developing a Continuation Fund, a project squarely within her purview as CLO.  Plaintiff later learned that AMPS gave the entire C suite except for her, even those not involved in working on the Continuation Fund and all male, significant financial compensation from this deal in the amount of $100,000. Plaintiff received nothing.

70.    In September 2021, Defendants again excluded Plaintiff, because of her gender, from a central duty of the CLO position - performing due diligence for an acquisition.  Instead, AMPS and Nadauld hired outside counsel to perform the due diligence, but after the deal was done and it was revealed that the outside counsel failed to do the necessary due diligence, AMPS asked Plaintiff to fix all the resultant problems.

71.    On or about April 22, 2022, the CEO informed Plaintiff that Defendants were not going to give her a bonus for yet another year.  He cited financial constraints as the reason and told Plaintiff that there was a hiring freeze.

72.    Defendants' claim that they were suffering financial constraints which prevented them from giving Plaintiff a bonus was belied by their July 2022 executive search for a new CRO.

10

73.    Two male candidates were put forth: one who applied independently, and the other, Jeff Zavada, who Defendant Nadauld recommended.

74.    Ms. Conte and CEO Fallbacher had significant concerns regarding Mr. Zavada's qualifications. Specifically, they had concerns that he had no experience in the industry AMPS services, and that Mr. Zavada said point blank during the interview that he would "fake it till he makes it".

75.    Despite Mr. Zavada's utter lack of experience, Defendant Nadauld "strongly" recommended he be hired.

76.    On or about July 19, 2022, AMPS hired Mr. Zavada as CRO, at Defendant Nadauld's strong urging, for a salary of $300,000, plus $100,000 bonus and commission.

77.    Defendants Cimarron and Nadauld told CRO Zavada that they expect the sales of AMPS Services services to double in 2023.

78.    CRO Zavada has a greater lack of knowledge about and experience with selling AMPS's services than anyone employed at AMPS.

79.    CRO Zavada relies on Plaintiff to do his job.

80.    CRO Zavada and his sales team continually asked Plaintiff to attend sales meetings, create sales presentations and pitch them to the clients, i.e. do the job of the CRO and his sales force.

81.    CRO Zavada also asked Plaintiff to train his sales staff on all of the AMPS Services and how to sell them because he has no knowledge of what AMPS services are or how to sell them to potential clients.  He does not know how to answer questions from staff or potential clients about AMPS Services.

11

82.     To date, CRO Zavada has not made any sales due to his utter lack of knowledge, experience and efficacy, but is compensated generously nonetheless.

83.     The clients have gone so far as to tell AMPS that Mr. Zavada, the Chief Revenue Officer whose job it is to sell, is not welcome to attend sales pitches given by Plaintiff and his sales team and/or calls with Plaintiff and his team regarding sales due to his *inability to understand how the services work*.

84.     Despite Defendants having just told Plaintiff that they did not have the money to give her a bonus or a raise and that there was a hiring freeze, in the fall of 2023 AMPS gave Mr. Zavada $1.6m to hire sales and account managers.

85.     All of Plaintiff's male comparators received large monetary bonuses in the range of $50,000-$100,000 or more, but AMPS never paid Plaintiff a bonus.

86.     Plaintiff later learned that in connection with the Continuation Fund being created, Defendants paid all the male members of the C Suite, as well as individual Vice Presidents, significant compensation, including raises, pay outs and bonuses, and additional equity.

87.     Plaintiff received nothing. Defendants kept the deal secretive and excluded Plaintiff .

88.     Shortly before December 7, 2022, Plaintiff complained to CEO Fallbacher that her salary was significantly lower than that of her male counterparts despite the fact that she was doing everyone's job and he told her that he had to speak with Defendant Nadauld  because the CEO did "not have the power to change or fix the problem".

89.     Defendants retaliated against Plaintiff as a result of her complaint by excluding her from meetings, ostracizing her and freezing her out of deals and responsibilities for the remainder of her employment with AMPS.

12

90. On December 7, 2022, Nadauld visited AMPS in person to discuss the resignation of the CFO and changes in the Sales Department.

91. During this visit, Nadauld held private meetings with each member of the C Suite, with one exception - Plaintiff . Nadauld met with the COO, Jonathan Jeffress, and told him he would receive a bonus and more equity. Nadauld met with Director of Data Analytics and told him he would be promoted to VP of Finance/Analytics, with a raise, bonus and additional equity.

92. Nadauld avoided Plaintiff for the entirety of his visit and refused to meet with her. Plaintiff caught Defendant Nadauld trying to sneak out the door and stood in his path. She requested that he meet with her as he had with all of the male C suite members. Nadauld acted put out and begrudgingly met with Plaintiff . Plaintiff again raised the issue that the men were being paid more for less experience and work.

93. Nadauld told Plaintiff that he would "think about it and get back to her"; he needed to discuss it further with CEO Fallbacher.

94. Later in December 2022, Plaintiff followed up with CEO Fallbacher and he told her that he still needed to speak to Nadauld about her complaints and he asked her to "wait" and "be patient". Plaintiff believed that AMPS was engaging in efforts to deal with the inequity.

95. In or about May 2023, Defendants hired Mr. Matthew Brow to replace CEO Fallbacher.

96. Mr. Brow had an official full-time start date of July 2023.

97. At the time of hire, Mr. Brow had absolutely no experience running a company or performing the duties of CEO and also had absolutely no experience in any of AMPS's service offerings.

98. Despite this utter lack of experience, Defendants are paying CEO Brow a salary of $600,000 per year.

13

99.     Mr. Brow also repeatedly asked Plaintiff for help doing his job, admitting that he doesn't know the AMPS vendor space or how AMPS Services and Company conduct business..

100.    Mr. Brow is also a member of Cimarron Board of Directors.

101.    On June 7, 2023, outgoing CEO Fallbacher and incoming CEO Mr. Brow worked on Mr. Brow's transition plan.

102.    At this time, CEO Fallbacher wrote a letter to Defendant Nadauld reiterating that Plaintiff was considerably undercompensated, in salary, lack of bonuses, equity and commissions for the sales Plaintiff closed and encouraging Defendants to correct it.

103.    On June 14, 2023, outgoing CEO Fallbacher, wanting to commit Defendants to a decision regarding Plaintiff's compensation, requested a meeting with Defendants, specifically Defendant Nadauld to get an answer.

104.    Defendant Nadauld advised Fallbacher that a decision "will be made in two weeks".

105.    In or about June, 2023, Plaintiff broached the subject of the pay disparity with  incoming CEO Brow, hoping to breathe fresh life into the matter.

106.    Mr. Brow told Plaintiff that he would have to speak to Defendant Nadauld about it at the Board of Directors meeting on October 2-3, 2023, and that she should wait until then and be patient.

107.    In or about August 22, 2023, Mr. Zavada hired an additional male salesperson with a base salary of $205,000, a $57, 500 *guaranteed commission* in the first 6 months, regardless of his having made any sales, and equity.

108.    On September 12, 2023, Mr. Zavada hired a male salesperson for a base salary of $255,000, *guaranteed commission* of $75,000 regardless of whether he made any sales, $100,000 bonus and equity.

14

109. On October 4, 2023, after the Board of Directors meeting, Plaintiff requested a meeting with Mr. Brow about her compensation. When they met on October 4, 2023, he told her that AMPS would not increase her salary of $235,000, but that she had equity in the company which would be worth $4-4.5m in two years when he sold the company, so she should not worry about her compensation.

110. At the October 4, 2023 meeting, it was confirmed for Plaintiff that Defendants were not going to increase her compensation to match that of her male comparators, whose job she was doing on a daily basis.

111. Defendants refused to pay her equivalent salary, bonuses, commissions and refused to match their equity.

112. Plaintiff realized on October 4, 2023, that nothing was going to change, and that Defendants had created an atmosphere which was too toxic to continue working in.

113. She was constructively discharged on October 13, 2023.

114. At no time during her employment did AMPS ever pay Plaintiff any bonus.

115. The hostile work environment created and tolerated by Defendants negatively affected Plaintiff's ability to perform her work duties.

116. As a result of the discrimination and hostile work environment perpetrated by Defendants, Plaintiff lost significant income and suffered from severe emotional distress in the form of stress, tension, anxiety, depression and sleeplessness.

117. Plaintiff timely filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination.

## COUNT I – GENDER DISCRIMINATION IN VIOLATION OF M.G.L. C. 151B
### (Defendants)

118.  The plaintiff hereby re-avers and realleges each and every allegation contained within paragraphs above as if expressly set forth herein.

119.  An employer shall not discriminate in compensation, terms or conditions of employment based on gender.  M.G.L. c. 151B s. 4.

120.  Defendants discriminated against Plaintiff on the basis of gender by paying her male comparators, whose job Plaintiff performed, more for less work.

121.  As a result of the discrimination by Defendants, Plaintiff suffered monetary loss, emotional distress and other damages.

## COUNT II – HOSTILE WORK ENVIRONMENT IN VIOLATION OF M.G.L. C. 151B
### (Defendants)

122.  The plaintiff hereby re-avers and realleges each and every allegation contained within paragraphs above as if expressly set forth herein.

123.  Hostile work environment exists when the workplace is pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, and poses a formidable barrier to the full participation of an individual in the workplace. Cuddyer v. Stop & Shop Supermarket Co., 434 Mass. 521, 532 (2001), *quoting* College-Town, Div. of Interco, Inc. v. Massachusetts Commn. Against Discrimination, 400 Mass. 156, 162 (1987); Prescott v. Higgins, 538 F.3d 32 (1st Cir. 2008).

124.  An employer is liable for discrimination committed by those on whom it confers authority.  College-Town, Div. of Interco, Inc. v. MCAD, 400 Mass. 156, 165 (1987), citing M.G.L. c. 151B s. 4(1).

125.  Defendants undermined, publicly humiliated and marginalized Plaintiff .

16

126.    The workplace created by Defendants was pervaded by harassment and abuse which was intimidating, humiliating and stigmatizing and posed a formidable barrier to Plaintiff's participation in the workplace.

127.    As a result of the discrimination and creation of a hostile work environment by Defendants, Plaintiff suffered monetary loss, emotional distress and other damages.

## COUNT III – RETALIATION IN VIOLATION OF M.G.L. C. 151B
### (Defendants)

128.    The plaintiff hereby re-avers and realleges each and every allegation contained within paragraphs above as if expressly set forth herein.

129.    Protection against retaliation is intended to protect individuals from discrimination, "motivated, at least in part, by a distinct intent to punish or to rid a workplace of someone who complains of unlawful practices.  M.G.L. c. 151B.

130.    The plaintiff does not need to establish the underlying discrimination in order to prove retaliation.  Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 474 Mass. 382, 405 (2016) (noting that a claim for retaliation is a separate and distinct from a claim of discrimination and may succeed even if the discrimination claim fails, provided "the claimant can prove that [she] reasonably and in good faith believed that the [employer] was engaged in wrongful discrimination."

131.    After Plaintiff complained of a disparity in compensation on the basis of gender, Defendants retaliated against Plaintiff by marginalizing her, ostracizing her and excluding her from her job duties and compensation.

132.    As a result of the retaliation by Defendants, Plaintiff suffered monetary loss, emotional distress and other damages.

17

## COUNT IV – VIOLATION OF THE MASSACHUSETTS EQUAL PAY ACT (MEPA)

133.    The plaintiff hereby re-avers and realleges each and every allegation contained within paragraphs above as if expressly set forth herein.

134.    M.G.L. c. 149 s. 105A provides that no employer shall discriminate in any way on the basis of gender in the payment of wages, or pay any person in its employ a salary or wage rate less than the rates paid to its employees of a different gender for comparable work.

135.    In determining whether two jobs are comparable, the court must undertake a two part analysis.  Jancey v. School Comm. of Everett, 421 Mass. 482, 488 (1995).

136.    First, the court must determine whether the substantive content of the jobs is comparable, that is, whether the duties of the jobs have "important common characteristics".  Id.

137.    Jobs need not be fungible, in order to be "of like or comparable character" within meaning of the Massachusetts Equal Pay Act (MEPA). Id.

138.     Then, the court must determine whether the two positions entail comparable skill, effort, responsibility, and working conditions.  Id.

139.    Plaintiff is not only comparable to both the COO and the CRO, she actually performed the functions of their jobs.

140.    Defendants are not entitled to the defense prohibiting Plaintiff from using the CRO as a comparator because the language in the statute: "variations in wages shall not be prohibited if based upon…a system which measures earnings by quantity or quality of production, sales, or revenue" does not apply in this situation because in the cases of both the former and current CROs, it was **Plaintiff** who produced both the quantity and quality of production, sales and revenue.

18

141.   As a result of Defendants' violation of the Massachusetts Equal Pay Act, for which there is strict liability, Plaintiff suffered financial loss.

WHEREFORE, the Plaintiff respectfully requests that this Court grant the following relief:

1.   Enter Judgment against Defendants;

2.   Award Plaintiff's attorney's fees and costs;

3.   Award compensatory damages for lost wages and benefits, emotional distress including physical manifestations of emotional distress, reputational damages, loss of enjoyment of life and other financial loss, plus interest;

4.   Award punitive damages pursuant to M.G.L. c. 151B;

5.   Award multiple damages pursuant to M.G.L. c. 151B

6.   Award multiple damages pursuant to M.G.L. c. 149 s. 105A;

7.   Award pre-judgment interest from the filing of this Action with the Massachusetts Commission Against Discrimination through judgment and post judgment interest;

8.   Award such other relief the Court deems fair and just.

### JURY CLAIM

The Plaintiff demands a trial by jury on all issues so triable.

**Respectfully submitted,**
**Plaintiff,**
By her attorney,

*/s/ Allison A. MacLellan*

Allison MacLellan, BBO No. 654586
MacLellan Law Firm
377 Willard Street, #236
Quincy, MA 02169
Telephone:  (617) 980-5999
amaclellan@maclellanlawfirm.com

Dated:  November 3, 2023

19